1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF ARIZONA**

5

6   **Western Alliance Bank,**                    )

7                    **Plaintiff,**              )        **2:14-cv-00761 JWS**

8           **vs.**                              )        **ORDER AND OPINION**
                                                 )
9   **Richard Jefferson,**                       )        **[Re: Motions at docket 127, 129, 131**
                                                 )        **and 132]**
10                   **Defendant.**              )
                                                 )
11  _____          )
                                                 )
12  **Richard Jefferson,**                       )
                                                 )
            **Counter-claimant,**                )
13                                               )
           **vs.**                               )
14                                               )
    **Western Alliance Bank,**                   )
15                                               )
            **Counter-defendant.**               )
16                                               )
    _____          )
17                                               )
    **Richard Jefferson,**                       )
18                                               )
            **Third-party plaintiff,**           )
19                                               )
           **vs.**                               )
20                                               )
    **Theodore Kritza & Michelle Lee**           )
    **Kritza,**                                  )
21                                               )
            **Third-party defendants.**          )
22  _____          )

23

24                        **I. MOTIONS PRESENTED**

25          Before the court are four summary judgment motions. At docket 127 third-party

26  defendants Theodore Kritza and Michelle Lee Kritza (collectively, "Kritza") filed a motion

27  for partial summary judgment supported by a statement of facts at docket 128.

28  Defendant, counter-claimant, and third-party plaintiff Richard Jefferson ("Jefferson") filed

    an opposition to Kritza's motion at docket 160 supported by a separate statement of

1  facts and controverting statement of facts at docket 161.  Kritza filed a reply in support

2  of his motion at docket 212 and a supplemental statement of facts at docket 226.

3  Jefferson filed a sur-response at docket 228 and a controverting statement of facts

4  regarding Kritza's supplemental statement of facts at docket 229.

5  At docket 131 plaintiff and counter-defendant Western Alliance Bank ("Alliance")

6  filed a motion for summary judgment supported by a statement of facts at docket 134.

7  Alliance argues that it is entitled to summary judgment pursuant to the ratification

8  doctrine and A.R.S. § 47-4406.  At docket 163 Jefferson filed an opposition to Alliance's

9  motion supported by his controverting statement of facts, objections, and additional

10  statement of facts at dockets 166 and 167.  At docket 174 Alliance filed a reply in

11  support of its motion, and at docket 177 it filed a separate response to Jefferson's

12  controverting statement of facts and additional statement of facts.  At docket 227 the

13  court granted Jefferson's motion to strike Alliance's filing at docket 177.

14  At docket 132 Kritza filed a joinder to Alliance's motion as it relates to the issue of

15  ratification and a motion for summary judgment on that issue.  At docket 164 Jefferson

16  filed an opposition to Kritza's motion supported by his objections and controverting

17  statement of facts at docket 165.  At docket 188 Kritza filed a reply in support of his

18  motion.

19  At docket 129 Jefferson filed a motion for partial summary judgment against

20  Kritza or, in the alternative, an order treating certain facts as established.  Jefferson's

21  separate statement of facts in support of his motion is at docket 130.  Kritza's opposition

22  to Jefferson's motion is at docket 158, which is supported by his controverting statement

23  of facts at docket 159.  Jefferson filed his reply at docket 175 and unredacted copies of

24  Exhibits 4 and 7 to Kritza's controverting statement of facts at docket 176, both under

25  seal.

26  Finally, at docket 162 Jefferson's counsel submitted an affidavit in which he

27  states that Jefferson cannot present facts essential to his oppositions to Kritza's and

28

Alliance's motions and therefore asks the court to deny those motions pursuant to Rule 56(d).

Oral argument was held on November 9, 2015.

## II.  BACKGROUND

Jefferson is a professional basketball player in the National Basketball Association ("NBA")[1] who employed Kritza from 2001 to 2013 as his personal business manager in charge of his day-to-day affairs, investments, and business ventures.[2]

**A.    The Alliance Line of Credit**

Alliance alleges that on October 5, 2004 it issued Jefferson a revolving line of credit in an original principal amount not to exceed $500,000 ("LOC") that Jefferson failed to pay by its maturity date.[3]  Alliance attached to its complaint the following documents as evidence of the parties' contractual relationship:

1.    An October 5, 2004 Consumer Revolving Line of Credit agreement (loan number 0129104825, "Loan 4825") with an October 5, 2005 maturity date;[4]

2.    A September 13, 2005 Change in Terms Agreement to loan 4825 that extended the LOC's maturity date to October 5, 2006;[5]

3.    A September 25, 2006 Change in Terms Agreement to loan 4825 that extended the LOC's maturity date to October 5, 2007;[6]

---

[1]Doc. 134 at 2-3 ¶¶ 1, 7; Doc. 134-1 at 3:23-24; Doc. 166 at 37 ¶ 1.

[2]Doc. 33 at 4 ¶ 13; Doc. 134-1 at 16:13-15, 17:1-14, 53:2-11, 101-02.

[3]Doc. 1-3 at 3 ¶ 6, 4 ¶ 12.

[4]Doc. 1-4 at 5-13 (Exhibit A).

[5]*Id.* at 15-21 (Exhibit B).

[6]*Id.* at 23-27 (Exhibit C).

4.    An August 13, 2007 Change in Terms Agreement to loan 4825 that extended the LOC's maturity date to October 5, 2008;[7]

5.    An August 5, 2008 Change in Terms Agreement to loan 4825 that extended the LOC's maturity date to August 15, 2009;[8]

6.    An August 15, 2009 Change in Terms Agreement to loan 4825 that extended the LOC's maturity date to August 15, 2010;[9]

7.    An August 16, 2010 Consumer Revolving Line of Credit agreement (loan number 129125289, "Loan 5289") with an August 15, 2011 maturity date;[10]

8.    A December 23, 2011 Promissory Note[11] and Business Loan Agreement[12] (loan number 0602129169, "Loan 9169") with a November 15, 2012 maturity date;

9.    A November 15, 2012 Change in Terms Agreement to loan 9169 that extended the loan's maturity date to January 15, 2013;[13]

10.   A January 15, 2013 Change in Terms Agreement to loan 9169 that extended the loan's maturity date to November 15, 2013.[14]

At his deposition Jefferson testified that he was advised by Kritza, his former agent Todd Eley ("Eley"), and former financial advisor Mark Love ("Love") to obtain a LOC to cover his expenses during the gap between his first and second NBA

---

[7]*Id.* at 29-35 (Exhibit D).

[8]*Id.* at 37-43 (Exhibit E).

[9]*Id.* at 45-51 (Exhibit F).

[10]*Id.* at 53-59 (Exhibit G).

[11]*Id.* at 61-62 (Exhibit H).

[12]*Id.* at 64-70 (Exhibit I).

[13]*Id.* at 72-75 (Exhibit J).

[14]*Id.* at 77-80 (Exhibit K).

contracts.[15]  He maintains, however, that his signature on the original Loan 4825 credit agreement was forged.[16]  Jefferson also testified that he did not know that the LOC was extended[17] or about any of the subsequent loan commitments that were taken out in his name.[18]  The five extensions of Loan 4825,[19] the original Loan 5289 document,[20] the Loan 9169 promissory note,[21] the Loan 9169 "business loan agreement,"[22] and the two

---

[15]Doc. 134-1 at 12:10-13, 94; Doc. 166-2 at 27:2-6.

[16]Doc. 166 at 62; Doc. 166-2 at 93 ("Q.  Are you taking the position that all of those documents that we have gone through from Alliance Bank that looks like it has your signature on it, are they all forgeries?  A.  The documents that I have seen today do not look like my signature.  Q.  Are you taking the position that they were forged?  A.  I'm taking the position that they are not my signature.").

[17]Doc. 134-1 at 18:10-12.  Jefferson testified that Kritza told him that the line of credit was paid off sometime around 2004 or 2005.  Doc. 166-2 at 27:10-21.  He also testified that he thought the line of credit was kept open after that, but did not know about any disbursements.  Doc. 134-1 at 25-26.

[18]Doc. 166-2 at 131:8-10.  *Id.* at 21-23 ("I believe there was a line of credit that was taken out in 2004, which I was informed was paid off, and that was the only one.").

[19]*See* the September 13, 2005 extension, doc. 134-2 at 84-86 (Richard Jefferson is the listed borrower and purported signatory); the September 26, 2005 extension, *id.* at 92-94 (same); the August 13, 2007 extension, *id.* at 98-100 (same); the August 5, 2008 extension, *id.* at 106-08 ("Richard Jefferson c/o Stratosphere Sports" is the listed borrower and Richard Jefferson is the purported signatory); and the August 15, 2009 extension, *id.* at 114-16 (same).

[20]*Id.* at 122-24 ("Richard Jefferson c/o Stratosphere Sports" is the listed borrower and Richard Jefferson is the purported signatory).

[21]*Id.* at 130-31 ("Richard Jefferson c/o Stratosphere Management LLC" is the listed borrower and Richard Jefferson is the purported signatory).

[22]*Id.* at 133-38 ("Richard Jefferson c/o Stratosphere Management LLC" is the listed borrower and Richard Jefferson is the purported signatory).

extensions of Loan 9169[23] all bear Jefferson's purported signature.  Jefferson testified that Kritza has admitted to forging his signature.[24]

Kritza testified that he helped get Jefferson's signature on the original Loan 4825 paperwork in 2004[25] and on the 2006 Change in Terms Agreement.[26]  Kritza also testified that Jefferson authorized him to extend the LOC and make disbursements from it.[27]

**B.  Stratosphere Management**

Kritza testified that in 2006 Jefferson agreed to help him fund a business he was starting called Stratosphere Management, LLC ("Stratosphere Management").  Kritza described his business plan for Stratosphere Management as a "24-hour concierge-type VIP service that was available to players."[28]  Kritza contends that Stratosphere Management executed a $500,000 promissory note in Jefferson's favor.[29]  Jefferson did not give these funds to Stratosphere Management directly, Kritza said.  Instead,

---

[23]*See* the November 15, 2012 extension, *id.* at 141-43 ("Richard Jefferson c/o Stratosphere Management LLC" is the listed borrower and Richard Jefferson is the purported signatory); the January 15, 2013 extension, *id.* at 146-48 (same).

[24]Doc. 166-2 at 93:5-8; *id.* at 109:15-18 ("Ted Kritza told me that he had signed documents in my name and had forged signatures, on a recorded call with the FBI, so that he could take out money in my name.").

[25]Doc. 134 at 7 ¶ 20; Doc. 134-1 at 65:4-7.

[26]Doc. 134 at 7 ¶ 20; Doc. 134-1 at 66:16-18.

[27]Doc. 134 at 4 ¶ 8; Doc. 134-1 at 70:12-15, 71:7-10.

[28]Doc. 166-3 at 22:15-18.

[29]Doc. 159-1 at 10:10-12 ("We had originally started with the $500,000 note to create the concierge service and move forward.").  *See also id.* at 47 § 14 ("Borrower acknowledges that $525,500.00 in loan proceeds are outstanding which represent principal and accrued interest owing by Borrower to Lender pursuant to Promissory Note issued to Lender by Borrower effectively dated July 29, 2006 in the original principal amount of $500,000.00, and cancelled concurrently with the issuance of the Note.").  The court was unable to find a copy of this promissory note in the record.  Jefferson apparently concedes that this note exists, but disputes its authenticity.  Doc. 161 at 9 ¶ 50.

1   Jefferson allowed Kritza to access the $500,000 Alliance LOC "so that line continued to

2   carry . . . a balance that was owed by [Kritza]."[30]

3          According to Kritza, Stratosphere Management executed a second promissory

4   note in 2008 that increased Jefferson's loan to $2 million and extended the loan's

5   maturity date to August 31, 2016.[31]  Kritza testified as follows:

> I put together a plan and went back and . . . discussed it with [Jefferson]
> on, I think it was two or three different occasions I remember one of them
> was during the All Star break—of expanding what Stratosphere
> Management was and to go out and form companies that were specifically
> related and tied into what the concierge service would need.  So there
> were entities that were created that helped in the transportation of cars, in
> the customization of vehicles. So a guy would buy a Lamborghini, for
> example, but he would want different things done to it, so they would go to
> this—it would stay in-house, basically. And that's where . . . the whole
> requirement of an extra million and a half dollars kind of fell on that plate
> as to creating all these other possibilities.[32]

12  Kritza has submitted an email exchange purportedly between Jefferson and Kritza in

13  2008 in which Kritza thanks Jefferson for "agreeing to increase and extend the term of

14  the LOC, so that [Kritza] can look at other opportunities," and Jefferson acknowledges

15  Kritza's email.[33]  The alleged 2008 promissory note does not reference the Alliance

16  LOC.

17         At his deposition Jefferson denied having any involvement with Stratosphere

18  Management.[34]  He denied loaning Stratosphere Management either $500,000 or $2

19  million, denied that Krtiza gave him either the $500,000 or the $2 million promissary

20  note, and denied authorizing Kritza to use the Alliance LOC to fund Kritza's business

---

23  [30]Doc. 166-3 at 21:21-23:10.  *See also id.* at 24:17-22; Doc. 159-1 at 25:1-3.

24  [31]Doc. 159-1 at 8:7-12:18, 25:1-3.  *See also id.* at 44-48 (the alleged $2 million
25  promissory note).

26  [32]Doc. 159-1 at 11:10-12:2.

27  [33]*Id.* at 50.

28  [34]Doc. 166-2 at 176:13-15.

-7-

investments.[35]  Jefferson testified that the first time he saw the $2 million note was when Eley emailed it to him, and that his signature on the note was forged.[36]

## C.    The 2011 NBA Lockout

Between July 1 and December 8, 2011 there was an NBA lockout,[37] during which time teams could not trade or enter into contracts with players.[38]  Jefferson testified that during the lockout Kritza told him he "was stressed" about the "financial strain" Jefferson would suffer if the lockout lasted all season.[39]  Jefferson testified that he was disappointed with the state of his personal finances after playing in the NBA for ten years and "confused as to some of the numbers," so he had Richard Murnick ("Murnick"), his current financial manager, review his finances.[40]

According to Murnick, Jefferson called him in late 2011 because Jefferson was concerned about not having as much money as he thought he should.[41]  Murnick said that after speaking with Jefferson, seeing his brokerage statement, and "thumb[ing] through" his tax return, he agreed with Jefferson "that there were some concerns."[42] "[T]he amount that was in the brokerage account—that it wasn't more—I was expecting

---

[35]Doc. 161-1 at 81:15-23, 106:5-12.

[36]Doc. 161-1 at 97:22-99:12.  Jefferson states that Eley sent this email "recently," but the court could not locate a copy of the email, which was apparently marked as exhibit 128.  Doc. 161 at 10 ¶ 51.  Jefferson cites pages 83 and 84 of the transcript from his February 13, 2015 deposition but does not provide the court with these pages either.

[37]Doc. 128 at 3 ¶ 11; Doc. 161 at 19 ¶ 11.

[38]Doc. 128 at 3 ¶ 12; Doc. 161 at 19 ¶ 12.

[39]Doc. 128-2 at 160:19-23, 163:6-8.  Jefferson later backtracked, testifying that Kritza "was not worried . . . he was not stressed, but he was preparing for the worst."  Doc. 128-2 at 193:2-4.

[40]Doc. 128-2 at 160:24-25, 161:1-5, 163:14-24, 167:11-13.

[41]Doc. 128-3 at 28-32.

[42]Doc. 128-3 at 40:22-25, 41:1-6.

to see more in the brokerage account," testified Murnick.[43]  Murnick also testified that Jefferson was concerned that Kritza "may have taken money from him."[44]  In November 2011 Jefferson hired Murnick to replace Love as his financial advisor.[45]

**D.    Jefferson Communicates Concerns to Kritza**

On February 8, 2012 Jefferson emailed Kritza stating that Murnick was going through his tax returns and that he did not understand why his savings were so low.[46] "Even if we included property we are so far off of the number we needed to be at," Jefferson stated.  "As my primary handler, that wasn't a red flag for you?"[47]  Kritza's response, sent the same day, addresses Jefferson's concerns: "there was the opportunity for you to save more, but you paid down your debt . . . and yes there were other situations and circumstances that took away for [sic] the ability to save."[48]

**E.    Jefferson Hires an Accountant to Review His Finances**

Jefferson testified that Kritza's response to his February 8 email led him to believe he "was not going to get very many answers" from Kritza, and so he hired accountant Jim Tucciarone ("Tucciarone") to review his finances.[49]  Tucciarone conducted an initial review of Jefferson's tax returns and investment documents[50] and concluded that these documents "raised questions as to the financial controls and

---

[43]Doc. 128-3 at 41:16-19.

[44]*Id.* at 54:9-12.  *See also id.* at 58:11-22.

[45]Doc. 134 at 10 ¶ 40; Doc. 166 at 108 ¶ 40.

[46]Doc. 128-2 at 199:11-200:2; Doc. 128-3 at 100.

[47]Doc. 128-3 at 101.

[48]*Id.* at 100.

[49]Doc. 128-2 at 205:3-11.  *See also* Doc. 128-3 at 41:2-6, 44:9-14, 45:11-18; 53:19-24.

[50]Doc. 128-3 at 187-201.

benefits of many of [Jefferson's] investments."[51]   In his June 12, 2012 engagement letter Tucciarone offered to provide Jefferson with a comprehensive review of his tax returns and other documents to demonstrate how his financial affairs were being managed.[52]   In the email that accompanied that letter Tucciarone stated, "Once signed I will send authorization that will allow me to contact Stratosphere and request documents.  We should get the management contract and see where we stand on relieving them of their duties ASAP."[53]   Jefferson engaged Tucciarone's services the following day.[54]

Jefferson testified that the more he learned from Tucciarone the more he believed "there was wrongdoing."[55]   But instead of filing a "lengthy" court case, Jefferson testified that he decided to "kind of just move on."[56]   "I really didn't believe that there was money to be found or money to be turned over," Jefferson testified.  "So I just decided to try and move on with my life and I pretty much let go of my entire team and just tried to focus on the rest of my career and my future earnings."[57]   On October 9, 2012 Jefferson executed a document stating that he was revoking the durable general power of attorney that he executed in favor of Eley and Kritza in 2011 any other powers of attorney he granted in favor of Eley and Kritza.[58]

---

[51]Doc. 128-3 at 176, 184; Doc. 161 at 8 ¶ 35.

[52]Doc. 128-3 at 184.

[53]*Id.* at 182.

[54]Doc. 161 at 8 ¶ 39.

[55]Doc. 128-3 at 11:3-8.

[56]*Id.*

[57]Doc. 161-5 at 26:17-21.

[58]Doc. 134 at 11 ¶ 42; Doc. 134-14 at 50; Doc. 161-1 at 74-75; Doc. 166 at 111 ¶ 42.

1  **F.  Jefferson Allegedly Confronts Kritza, Contacts Alliance**

2       Jefferson testified that he did not know that Kritza "was the individual that had

3  taken out this money and taken out loans and used my money to pay back certain

4  loans" until he got a permanent mailing address and started receiving documents from

5  Alliance Bank.[59]  Jefferson testified:

6       when Ted Kritza was no longer receiving my mail . . . I started receiving . .
       . all of my statements from Alliance Bank, I found some discrepancies.  I

7       first contacted Ted Kritza about them.  Apparently he had a loan that was
       taken out in my name, so I addressed that.  He told me that he was paying

8       off this loan that I was not aware of.  And so I want to say a month later I
       received a document saying that I owed an amount of money, and I was

9       confused and so I called the bank myself.[60]

10  Former-Alliance employee Gina McRostie ("McRostie") testified that Jefferson called her

11  to request information about his accounts in the fall of 2013.[61]  On October 11, 2013

12  McRostie emailed Jefferson bank statements related to the Alliance LOC.[62]  Her email

13  notes that "the line was continuous but had three different account numbers due to bank

14  changes in documentation."[63]  By no later than October 15, 2013, Jefferson, through his

15  attorney Bryan Saalfeld ("Saalfeld"), had contacted the FBI about his Alliance account.[64]

16  **G.  The Forbearance Agreement**

17       In a November 11, 2013 letter Saalfeld asked Alliance for "an immediate

18  forbearance on any payments owing and/or due on Alliance Bank of Arizona Loan

19  Account Number #602129169, unlawfully registered in [Jefferson's] name c/o

20

21

22  ───────────────

23       [59]Doc. 161-5 at 27:12-16; Doc. 166-2 at 123:22-25.

24       [60]Doc. 166-2 at 24:4-14.  *See also id.* at 123:22-125:14.

25       [61]Doc. 134 at 11 ¶ 45; Doc. 134-2 at 48 p.134:21-135:7.

26       [62]Doc. 134-3 at 2-104.

27       [63]*Id.* at 2.

28       [64]Doc. 134-16 at 37.

1    Stratosphere Mgt, LLC."[65]  Saalfeld explained that such a forbearance was justified by

2    the Department of Justice's criminal investigation into fraud perpetrated against

3    Jefferson "and the fact that Mr. Jefferson did not knowingly consent to the account, or

4    any of the amounts apparently owing and due on the account."[66]  Alliance responded by

5    proposing terms for a potential forbearance agreement[67] and providing Saalfeld with

6    loan documents related to the LOC.[68]  Jefferson and Alliance executed the forbearance

7    agreement on December 20, 2013.[69]  Under the terms of this agreement, Jefferson

8    acknowledged that he entered into the LOC, which matured on November 15, 2013,

9    and agreed to make a $50,000 principal reduction payment.  Alliance agreed to "forbear

10   from the exercise of any of its rights and remedies . . . in connection with" the LOC's

11   maturity until January 15, 2014.[70]  Jefferson's failure to repay the LOC's balance by this

12   January 2014 deadline is the operative default alleged in the one-count breach of

13   contract action that Alliance brought against Jefferson in state court.[71]

14   **H.    Procedural History**

15        Jefferson removed the case to this court,[72] filed his answer, and brought two

16   negligence counterclaims against Alliance.  In his answer Jefferson admits that he is the

17   borrower listed on the paperwork for above-referenced loans but he claims that his

18

19

20   ────────────────

21   [65]Doc. 134-15 at 2

22   [66]*Id.*

23   [67]Doc. 162-1 at 4-6.

24   [68]Doc. 134-15 at 5-79.

25   [69]Doc. 134-14 at 52-55.

26   [70]*Id.* at 52-55.

27   [71]Doc. 1-3 at 4 ¶¶ 10-13.

28   [72]Doc. 1.

1 signature was forged.[73]  Jefferson's first counterclaim alleges that Alliance was

2 negligent in failing "to implement and/or follow appropriate procedures to verify the

3 authenticity of the signatures on documents purporting to name Jefferson" as a

4 borrower.[74]  His second counterclaim alleges that Alliance was negligent in supervising

5 and training its agents.[75]

6 Jefferson then filed a ten-claim third-party complaint against Kritza alleging: (1)

7 fraud/concealment; (2) breach of fiduciary duty; (3) negligence; (4) breach of contract;

8 (5) negligent misrepresentation; (6) unjust enrichment; (7) accounting; (8) conversion;

9 (9) contribution/indemnification; and (10) a declaratory judgment regarding

10 contribution/indemnification.[76]  Jefferson later amended his third-party complaint to

11 name Kritza's wife as an additional third-party defendant.[77]

12 ### III.  DISCUSSION

13 **A.    Jefferson's Rule 56(c)(2) Objections**

14 Before discussing the merits of the parties' motions, it is necessary to address

15 Jefferson's Rule 56(c)(2) objections.  Rule 56(c)(2) states that at summary judgment "[a]

16 party may object that the material cited to support or dispute a fact cannot be presented

17 in a form that would be admissible in evidence."  The advisory committee note states

18 that a Rule 56(c)(2) objection "functions much as an objection at trial, adjusted for the

19 pretrial setting.  The burden is on the proponent to show that the material is admissible

20 as presented or to explain the admissible form that is anticipated."[78]  "If the case goes to

21

22 ────────────

23 [73]Doc. 14.

24 [74]*Id*. at 16-17 ¶ 13.

25 [75]*Id*. at 18 ¶ 20.

26 [76]Doc. 16.

27 [77]Doc. 33.

28 [78]Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

1   trial, failure to challenge admissibility at the summary-judgment stage does not forfeit

2   the right to challenge admissibility at trial."[79]

3       Jefferson has raised hundreds of Rule 56(c)(2) objections to the materials cited

4   in Alliance's and Kritza's statements of facts.  For example, Alliance's statement of facts

5   is 60 paragraphs long and Jefferson raises a bevy of mostly boilerplate objections to

6   each paragraph except the first.  A majority of these objections are inappropriate in the

7   context of summary judgment.

8       Jefferson's objections that cited materials are irrelevant, vague, ambiguous, or

9   inadmissible under Evidence Rule 403 are all inappropriate because they duplicate the

10  summary judgment standard itself.  Because the court "can award summary judgment

11  only when there is no genuine dispute of *material* fact,"[80] it cannot rely on irrelevant,

12  vague, ambiguous, or otherwise insufficiently-probative evidence.  "Similarly,

13  statements in declarations based on speculation or improper legal conclusions, or

14  argumentative statements, are not *facts* and likewise will not be considered on a motion

15  for summary judgment.  Objections on any of these grounds are simply superfluous in

16  this context."[81]

17      A number of Jefferson's objections argue that cited materials are

18  inadmissible—for example, because they contain testimony not made under oath—but

19  not that such materials *cannot* be presented in an admissible form at trial.  These

20  objections are insufficient under Rule 56(c)(2) and are overruled.  Further, the court

21  notes that Jefferson regularly objects to deposition testimony as not being made under

22  oath.[82]  These objections have no basis in fact, and are overruled.

[79]*Id.*

[80]*Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (emphasis in original).

[81]*Id.* (emphasis in original).

[82]*See, e.g.,* doc. 161 at 12 ¶ 5; doc. 166 at 54-55 ¶ 8.

-14-

1    The court has considered the remainder of Jefferson's objections.  Those that

2    merit discussion are mentioned below.

3    **B.    Ratification**

4    Ratification is a doctrine that arises in various contexts, and is generally defined

5    as "[c]onfirmation and acceptance of a previous act, thereby making the act valid from

6    the moment it was done." [83]   In the context of agency law, a person ratifies a prior act in

7    two ways: (1) by "manifesting assent that the act shall affect the person's legal

8    relations;" or (2) by "conduct that justifies a reasonable assumption that the person so

9    consents."[84]   One example of such conduct is knowingly accepting the benefit of a

10   transaction.[85]  "This is so even though the person also manifests dissent to becoming

11   bound by the act's legal consequences."[86]

12   Alliance argues that even if Kritza forged the LOC documents, Jefferson explicitly

13   ratified them in the forbearance agreement, and implicitly through his conduct in

14   transferring the LOC's proceeds into his personal bank account on multiple occasions[87]

15   and deducting the LOC's interest on his tax return.[88]  Because Jefferson explicitly

16

17

18   _____

19   [83]*Ratification*, Black's Law Dictionary (10th ed. 2014).  *See also* Restatement (Third) Of
     Agency § 4.01 cmt. c (2006).

20
21   [84]Restatement (Third) Of Agency § 4.01(2).

22   [85]*Miller v. Boeger*, 405 P.2d 573, 576 (Ariz. Ct. App. 1965).  *See also* Restatement
     (Third) Of Agency § 4.01 cmt. g ("A person may ratify an act under subsection (2)(b) by
23   receiving or retaining benefits it generates if the person has knowledge of material facts and no
     independent claim to the benefit.") (citation omitted).

24   [86]Restatement (Third) Of Agency § 4.01 cmt. d.

25   [87]Alliance cites its own interrogatory response that identifies the destination of funds
26   transferred from the Alliance LOC between 2004 and 2013.  Doc. 134-14 at 22-24.

27   [88]Doc. 131 at 14.  Alliance cites what it describes as Jefferson's 2012 tax return, which
     shows a $26,304 deduction for the Alliance LOC, doc. 134-14 at 16-17, and Jefferson's
28   accountant's deposition testimony regarding that return.  Doc. 134-14 at 13:17-22.

1    consented to be bound by the Alliance LOC under the forbearance agreement, there is

2    no need to consider implicit ratification.[89]

3         Jefferson raises four arguments in opposition.  First, he argues that Alliance is

4    judicially estopped from raising ratification.  Second, he argues that Kritza "went rogue"

5    and therefore lacked apparent authority to bind Jefferson to the LOC documents.  Third,

6    he argues that forgeries cannot be ratified.  And fourth, he argues that the alleged

7    ratification is ineffective because he lacked knowledge of all material facts regarding the

8    "true status" of the Alliance LOC.

9              **1.    Judicial estoppel does not apply**

10        The purpose of judicial estoppel is to protect the integrity of the judicial system by

11   preventing a party from changing its litigation positions.[90]  "[S]everal factors typically

12   inform the decision whether to apply the doctrine in a particular case."[91]  The most

13   relevant factor here is that courts have "restricted the application of judicial estoppel to

14   cases where the court relied on, or 'accepted,' the party's previous inconsistent

15   position."[92]

16        Jefferson argues that Alliance is judicially estopped from asserting the ratification

17   doctrine because that theory is at odds with the arguments Alliance "prevailed upon" in

18

19        [89]Jefferson objects to the forbearance agreement on the ground that it has not been
     authenticated and is not self-authenticating.  Doc. 166 at 113.  Because Jefferson does not
20   argue that Alliance cannot authenticate this document at trial, this objection is overruled.  Fed.
     R. Civ. P. 56(c)(2).

21
          [90]*Bank of Am. Nat. Trust & Sav. Ass'n v. Maricopa Cnty.*, 993 P.2d 1137, 1139 (Ariz. Ct.
22   App. 1999) (quoting *State v. Towery*, 920 P.2d 290, 304 (Ariz. 1996)).  *See also New
     Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Neither party addresses whether state or
23   federal law applies to Jefferson's judicial estoppel argument.  Because his argument fails under
     both, there is no need for the court to reach this question.
24

25        [91]*New Hampshire*, 532 U.S. at 750.

26        [92]*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).  *See also
     Bank of Am. Nat. Trust & Sav. Ass'n*, 993 P.2d at 1140 (holding that judicial estoppel does not
27   apply "unless (a) the court in that proceeding granted the party relief or accepted the party's
     earlier inconsistent position either as a preliminary matter or as part of a final disposition, and
28   (b) the party's inconsistent position was a significant factor in the relief granted.").

1   defeating Jefferson's motion for a more definite statement at docket 5.[93]   Specifically,

2   Alliance argued in opposition to that motion that there was "nothing ambiguous or

3   confusing about Alliance's less than five page Complaint which makes a very simple,

4   concise, and direct breach of contract claim against Jefferson."[94]

5          The main issue before the court was whether Alliance's complaint "is so vague or

6   ambiguous" that Jefferson could not reasonably prepare a response.[95]   The court

7   denied Jefferson's motion, ruling that Alliance's complaint asserts a straightforward

8   claim that is not vague or ambiguous.[96]   Whether Alliance loaned money to Jefferson

9   directly, or indirectly through Krtiza, was immaterial to the court's decision.   Judicial

10  estoppel does not apply.

11          **2.      Kritza's apparent authority is irrelevant**

12         Jefferson argues that Alliance cannot establish ratification because it has not

13  shown that Kritza acted with apparent authority.   But Alliance need not show that Kritza

14  acted with apparent authority to establish ratification.   In contrast to apparent authority,

15  which depends on the principal's manifestations to the third party, ratification requires

16  only "an objectively or externally observable indication that a person consents that

17  another's prior act shall affect the person's legal relations."[97]   "[T]he consent need not

18  be communicated to the third party or the agent.   This is so because the focal point of

19  ratification is an observable indication that the principal has exercised choice and has

20  consented."[98]

21

22

23         [93]Doc. 163 at 14.

24         [94]Doc. 11 at 2.

25         [95]Fed. R. Civ. P. 12(e).

26         [96]Doc. 13.

27         [97]Restatement (Third) Of Agency § 4.01 cmt. d.

28         [98]*Id.*

-17-

### 3.    Forgeries can be ratified

"At common law it was held by some, but not all, courts that a forgery . . . could not be ratified."[99]  One rationale behind this doctrine was that a forger is not an agent because she "purports to act, not for someone else, but as someone else."[100]  Other courts, such as the Pennsylvania courts that Jefferson cites, held that a forgery cannot be ratified as a matter of public policy because forgery is a crime.[101]  The rule against ratification of forgeries "was not uniformly supported by the cases," however, "with some cases holding ratification by a principal to be effective although it did not relieve the forger of criminal liability."[102]

"Most contemporary courts recognize that a forgery may be ratified because pretending to be the principal is not so different from pretending to have authority to act on behalf of the principal."[103]  Consistent with this modern trend, the UCC provides that "[a]n unauthorized signature may be ratified for all purposes of" Article 3.[104]  Arizona codified this rule at A.R.S. § 47-3403(A).  "Although a forger is not an agent, ratification

---

[99]Restatement (Second) of Agency § 85 cmt. b (1958).

[100]Restatement (Third) Of Agency § 4.03 cmt. c.

[101]Doc. 163 at 16-17.  *See, e.g., Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 702 (3d Cir. 1995) ("Pennsylvania does not permit ratification of a forgery on a non-negotiable item."); *Funds for Bus. Growth, Inc. v. Woodland Marble & Tile Co.*, 278 A.2d 922, 925 (Pa. 1971) ("It has long been an established principle in this Commonwealth that a forgery may not be ratified since it is a crime the adjustment of which is forbidden by public policy.").

[102]Restatement (Third) Of Agency § 4.03 cmt. c.  *See, e.g., Rakestraw v. Rodrigues*, 500 P.2d 1401, 1405 (Cal. 1972) ("[T]he ratification of an act of forgery by one held out to be a principal creates an agency relationship between such person and the purported agent and relieves the agent of civil liability to the principal which otherwise would result from the fact that he acted independently and without authority."); *President, etc., of Greenfield Bank v. Crafts*, 86 Mass. 447, 455 (Mass. 1862).

[103]Restatement (Third) Of Agency § 4.03 reporter's note c.  *See also Scott D. Erler, D.D.S. Profit Sharing Plan v. Creative Fin. & Investments, L.L.C.*, 203 P.3d 744, 752 (Mont. 2009) (compiling cases).

[104]U.C.C. § 3-403(a) (2002).

is governed by the rules and principles applicable to ratification of unauthorized acts of an agent"[105] because a person's retroactive adoption of a forger's signature, like ratification under agency law, "is a unilateral expression of a person's consent."[106]

A.R.S. § 47-3403(A) does not control here because Alliance does not contend that the forbearance agreement is a negotiable instrument.  And no party cites on-point authority from Arizona regarding the ratification of a forged nonnegotiable instrument. The only Arizona case that Jefferson cites is a case from 1898, *Barry v. Kirkland*, involving an oral promise to pay a forged note that was made under the misapprehension that their signatures on the note were authentic.[107]  The Supreme Court of the Territory of Arizona considered numerous authorities from other jurisdictions, including Pennsylvania, which hold that a forgery cannot be ratified.[108]  But *Barry* is unavailing to Jefferson because the court declined to adopt such a per se rule[109] and in any event was analyzing a negotiable instrument.[110]  Kritza cites *Cook v. Great Western Bank & Trust,* but that case is similarly inapposite because it was decided under Article 3 of the UCC.[111]

"When interpreting state law, federal courts are bound by decisions of the state's highest court."[112]  If that court has not addressed the relevant issue, the district court

---

[105]U.C.C. § 3-403 cmt. 3.

[106]Restatement (Third) Of Agency § 4.03 cmt. c.

[107]52 P. 771, 771 (Ariz. 1898).

[108]*Id.* at 772.

[109]*Id.* at 773.

[110]*Id.* at 772-73 (citing 1 John W. Daniel, *Daniel on Negotiable Instruments* § 859 (1879); 2 *Daniel on Negotiable Instruments* § 1352).

[111]685 P.2d 145, 148-50 (Ariz. Ct. App. 1984) (interpreting A.R.S. § 44–2541 (repealed)).

[112]*Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir.1996) (quotation omitted).

-19-

1  must use its best judgment to predict how the highest state court would resolve it "using

2  intermediate appellate court decisions, decisions from other jurisdictions, statutes,

3  treatises, and restatements as guidance."[113]  Because the Arizona Supreme Court has

4  not decided whether a forged nonnegotiable instrument can be ratified, the court must

5  use its best judgment to predict how it would rule.  Given the weight of modern

6  authority, the fact that the Arizona legislature has provided that forged negotiable

7  instruments can be ratified, and the absence of compelling reasons why Arizona law

8  should "treat contracts and negotiable instruments differently"[114] in this context, the court

9  concludes that the Arizona Supreme Court would likely hold that forged nonnegotiable

10  instruments can be ratified, governed by the "rules and principles applicable to

11  ratification of unauthorized acts of an agent."[115]

12        **4.**    **Jefferson's knowledge of material facts**

13       "Ratification requires that a principal have full and actual knowledge of all

14  material facts at the time he, by subsequent act or conduct, binds himself to a

15  previously unauthorized act of an agent."[116]  Jefferson argues that Alliance

16  misrepresented that the LOC was one line of credit when it was actually three separate

17  lines, and concealed the fact that the first two loans had already been paid off.[117]  As a

18  result, Jefferson argues that he did not know all of the material facts when he signed the

19  agreement.

20  _____

21      [113]*Id.* (quotation omitted).  *See also Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.,
Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

22

23      [114]*Life Investors Ins. Co. of Am. v. Estate of Corrado*, 838 N.W.2d 640, 647 (Iowa 2013).

24      [115]U.C.C. § 3-403 cmt. 3.  *See also* Restatement (Third) Of Agency § 4.03 cmt. c; *Estate
of Corrado*, 838 N.W.2d at 647.

25      [116]*Murdock-Bryant Constr., Inc. v. Pearson*, 703 P.2d 1206, 1213 (Ariz. Ct. App. 1984).

26  *See also* Restatement (Third) Of Agency § 4.06 ("A person is not bound by a ratification made
without knowledge of material facts involved in the original act when the person was unaware of

27  such lack of knowledge.").

28      [117]Doc. 163 at 16-17.

1    A fact is material if "a reasonable person 'would attach importance to its

2   existence or nonexistence in determining [his or her] choice of action in the transaction

3   in question.'"[118] In the context of ratification, materiality is concerned with "the relevance

4   of the fact to the principal's consent to have legal relations affected by the agent's

5   act."[119]  Thus, a fact is material here if a reasonable person in Jefferson's position would

6   have attached importance to its existence or nonexistence when determining whether to

7   sign the forbearance agreement.  "Materiality is generally a question of fact, but may be

8   resolved as a matter of law where the information is so obviously important or

9   unimportant . . . that reasonable minds could not differ on the question of

10   immateriality."[120]

11    The court agrees with Kritza[121] that no reasonable juror could find that the facts of

12   which Jefferson was allegedly unaware would have influenced a reasonable person's

13   decision to consent to be bound by the LOC.  Jefferson testified that he believed that

14   the LOC he authorized in 2004 was paid off in 2004 or 2005 and that he did not

15   authorize any subsequent disbursements from that LOC.[122]  Before he signed the

16   forbearance agreement, Jefferson was provided with documents that show that the

17   original LOC was extended and that two other loan commitments with different loan

18   numbers were taken out in his name.  Jefferson possessed full and actual knowledge of

19   all material facts at the time he bound himself to the debt that Kritza allegedly incurred.

20    Jefferson's professed misunderstanding that the debt was based on the original

21   LOC instead of a new LOC does not change the court's analysis.  Regardless whether

23   [118]*Sitton v. Deutsche Bank Nat. Trust Co.*, 311 P.3d 237, 243 (Ariz. Ct. App. 2013)
24   (quoting Restatement (Second) of Torts § 538(2)(a) (1977)).

25   [119]Restatement (Third) Of Agency § 4.06 cmt. c.

26   [120]*Caruthers v. Underhill*, 287 P.3d 807, 818 (Ariz. Ct. App. 2012).

27   [121]Doc. 188 at 6.

28   [122]Doc. 134-1 at 18, 25-26.

1   the debt was based on unauthorized disbursements from the original LOC that was

2   extended without authorization, or a new LOC that was obtained without authorization,

3   the salient fact that Jefferson cannot avoid is that he knew he did not authorize Kritza to

4   incur the debt.[123]  Yet, he nevertheless affirmed his obligation to repay that debt, and

5   Alliance granted him an extension of time to do so.[124]  Whether the debt was based on

6   one continuous line of credit or a series of lines of credit was immaterial.[125]

7   **C.   The Effect of Ratification on Jefferson's Third-Party Complaint**

8         "Ratification recasts the legal relations between the principal and agent as they

9   would have been had the agent acted with actual authority."[126]  "The principal thereby

10  consents to the agent's acts, including acts that would otherwise constitute breaches of

11  fiduciary duty."[127]  Kritza asserts that Jefferson ratified not only the LOC, but also "any

12  alleged misconduct by Kritza related to the line of credit."[128]  Jefferson's opposition does

13  not discuss how ratification would affect his third-party claims.  At oral argument

14  Jefferson's counsel cited *Fid. & Deposit Co. of Maryland v. Bondwriter Sw., Inc.*,[129] and

15

---

16  [123]*See, e.g.,* Doc. 160 at 17 (Jefferson admits that in October 2013, before he signed the

17  forbearance agreement, he learned that Kritza was unlawfully using the LOC funds).

18  [124]Doc. 134-14 at 53.

19  [125]This conclusion also disposes of Jefferson's argument that the forbearance

20  agreement is voidable because of Alliance's failure to disclose the "true status" of the debt.
    Doc. 163 at 17.  Although ratification is not effective if it is induced by conduct that would make

21  a contract voidable, Restatement (Third) of Agency § 4.02 cmt. c, "a non-fraudulent
    misrepresentation does not make [a] contract voidable unless it is material."  Restatement

22  (Second) of Contracts § 164 cmt. b (1981).

23  [126]*Fid. & Deposit Co. of Maryland v. Bondwriter Sw., Inc.*, 263 P.3d 633, 639 (Ariz. Ct.
    App. 2011) (citing Restatement (Third) of Agency § 4.02 cmt. b).

24  [127]Restatement (Third) Of Agency § 4.02 cmt. c.

25  [128]Doc. 132 at 4.

26  [129]263 P.3d 633, 639 (Ariz. Ct. App. 2011) ("Ratification is not effective in favor of an

27  agent against a principal when 'the principal is obliged to affirm in order to protect his own
    interests,' or when the principal ratifies to avoid a loss.") (quoting Restatement (Second) of

28  Agency § 101(b); citing Restatement (Third) of Agency § 4.02(2)(b)).

argued for the first time that ratification is ineffective in favor of Kritza because Jefferson signed the forbearance agreement to protect his own interests.  Jefferson waived this argument by not raising it in his opposition.[130]

The court agrees with Kritza that Jefferson's ratification of the LOC bound him to the terms of the allegedly forged LOC documents as if he had signed them himself. Accordingly, Jefferson's claims for fraud/concealment (count one),[131] negligence (count three),[132] negligent misrepresentation (count five),[133] contribution/indemnification (count nine),[134] and declaratory judgment (count ten)[135] all fail because each requires Jefferson to show that Kritza is at fault for approving, extending, or amending the LOC.  Judgment will be entered in Kritza's favor on these claims, and Jefferson's motion for partial summary judgment will be denied.[136]

---

[130]Doc. 164; Doc. 165 at 10-17.  *See also* Doc. 97; Doc. 99; Doc. 163 at 9-13, 16-17; Doc. 166 at 28-37; *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010) (arguments raised for first time at oral argument are waived).

[131]Doc. 33 at 5 ¶ 18 ("Between 2004 and 2013, T. Kritza intentionally failed to disclose an important fact to Jefferson, that he was fraudulently *amending and extending* the purported LOC with Alliance.") (emphasis added).

[132]*Id.* at 6 ¶ 31 ("T. Kritza breached his duty by failing to implement and/or follow appropriate procedures to manage Jefferson's business accounts and ventures, specifically as it relates to *verifying Jefferson's approval of the purported Alliance Line of Credit*.") (emphasis added).

[133]*Id.* at 8 ¶ 40 ("In his role as Jefferson's business manager between 2001 through 2013, T. Kritza negligently gathered, compiled, and communicated information regarding the purported Line of Credit agreements to Jefferson.); *id.* at ¶ 45 ("If T. Kritza disclosed his true activities to Jefferson, Jefferson *would not have approved of the Line of Credit*.") (emphasis added).

[134]*Id.* at 10 ¶ 60 (alleging that if Jefferson is found liable to Alliance for the LOC, he "would be obligated to pay sums representing a percentage of liability not Jefferson's own, but rather that of T. Kritza and the community of T. Kritza and M. Kirtza.").

[135]*Id.* at 10-11 ¶ 63 ("Jefferson desires adjudication determination [sic] of the respective rights and duties of Jefferson and T. Kritza and the community of T. Kritza and M. Kritza *with respect to the damages claimed in the Action against Jefferson*.") (emphasis added).

[136]Doc. 129.

1    But Kritza goes too far in arguing that Jefferson ratified all of Kritza's unspecified

2  "misconduct" related to the LOC.  Jefferson's claims for breach of fiduciary duty (count

3  two),[137] breach of contract (count four),[138] unjust enrichment (count six),[139] accounting

4  (count seven),[140] and conversion (count eight)[141] each allege acts of "misconduct" that

5  Jefferson did not ratify by affirming the LOC.  Jefferson's unjust enrichment and

6  accounting claims do not depend on the validity of the LOC, nor do Jefferson's breach

7  of fiduciary duty, breach of contract, or conversion claims to the extent those claims are

8  based on Kritza use of or control over the LOC funds.  Kritza's motion for summary

9  judgment at docket 132 will be denied as to counts six and seven, and granted in part

10  and denied in part as to counts two, four, and eight.

11  **D.    Whether Jefferson's Entire Third-Party Complaint Fails Because His Rule
           14 Claims Fail**

12        Kritza argues that if Jefferson's two Rule 14 claims (counts nine and ten) are not

13  viable then "the entire third-party complaint cannot move forward."[142]  He relies on cases

14  where courts have dismissed third-party complaints in their entireties because the third-

15  party plaintiffs failed to successfully implead the third-party defendants under Rule

16

17

18    [137]Doc. 33 at 6 ¶ 26 ("T. Kritza violated and breached his fiduciary duties . . . through his
19  unauthorized use *unauthorized use, extension and amendment* of the alleged Line of Credit
    without Jefferson's knowledge.") (emphasis added).

20    [138]*Id.* at 7 ¶ 35 ("T. Kritza breached his obligations under the contract, including but not
21  limited to the implied covenant of good faith and fair dealing, by, among other things, forging
    Jefferson's signature on certain various documents and *misappropriating monies through the*
22  *purported Alliance LOC.*") (emphasis added).

23    [139]*Id.* at 8 ¶ 47 (". . . T. Kritza obtained possession and control of the LOC fund to
    the exclusion of Jefferson; T. Kritza defrauded and tortiously misrepresented Jefferson in order
24  to *unlawfully obtain dominion and control of Jefferson's LOC funds.*") (emphasis added).

25    [140]*Id.* at 9 ¶¶ 50-52 (requesting an accounting and return "of all funds taken by T.
26  Kritza.").

27    [141]*Id.* at 9 ¶ 55 (". . . T. Kritza's control or possession of the LOC Fund is not lawful.").

28    [142]Doc. 132 at 2.

1  14(a).[143]  These cases are inapposite because the court has already ruled, at docket

2  183, that Jefferson successfully impleaded Kritza under Rule 14(a).[144]  Kritza cites no

3  authority for the proposition that a court must dismiss a third-party plaintiff's additional

4  claims that were joined under Rule 18(a) once his Rule 14(a) claims are resolved.  The

5  court sees no basis for so holding here.  For example, Kritza does not contend that this

6  court no longer has subject matter jurisdiction over Jefferson's remaining claims.[145]

7  **E.   Whether Jefferson's Tort Claims Are Timely**

8       Kritza's motion at docket 127 seeks partial summary judgment on several of

9  Jefferson's claims, including his remaining breach of fiduciary duty and conversion

10 claims.  Kritza argues that these claims are time-barred under the applicable two-year

11 statute of limitations[146] because they accrued before June 12, 2012.[147]  In response,

12 Jefferson argues that whether his tort claims are time barred is at most a disputed

13 question of material fact under Arizona's "discovery rule."  The court agrees with

14 Jefferson.

---

19 [143]*Stewart v. Am. Int'l Oil & Gas Co.*, 845 F.2d 196, 200 (9th Cir. 1988); *United States v.*

20 *One 1977 Mercedes Benz, 450 SEL, VIN 11603302064538*, 708 F.2d 444, 452 (9th Cir. 1983);
   *TRC & Associates v. NuScience Corp.*, No. 2:13-CV-6903-ODW CWX, 2014 WL 211781, at *3-

21 4 (C.D. Cal. Jan. 13, 2014); *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL
   2345129, at *3 (N.D. Cal. June 5, 2008).

23 [144]Doc. 183 at 20-21.

24 [145]Jefferson's remaining claims are independently supported by this court's diversity
   jurisdiction.

25 [146]A.R.S. § 12-542 (setting out two year statute of limitations for tort claims).  *See CDT,*

26 *Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, 7 P.3d 979, 981 (Ariz. Ct. App. 2000) (applying
   A.R.S. § 12-542 to breach of fiduciary duty claim); *Jackson v. Am. Credit Bureau, Inc.*, 531 P.2d

27 932, 934 (Ariz. Ct. App. 1975) (applying A.R.S. § 12-542 to conversion claim).

28 [147]Doc. 16 (Jefferson filed his third-party complaint against Kritza on June 12, 2014).

Arizona law's discovery rule applies where "the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect."[148]  "The rationale offered for the discovery rule 'is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists.'"[149]  The plaintiff bears the burden of establishing that the discovery rule applies.[150]  "When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury."[151]

Under the discovery rule, a cause of action "does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause."[152]  Thus, a cause of action accrues if the plaintiff knows (1) that a wrong occurred and caused injury (the "what") and (2) the person or entity at fault (the "who").[153]  Even where the plaintiff lacks actual knowledge of the "what" or "who," however, she is "charged with a duty to investigate with due diligence to discover the necessary facts."[154]

Under this duty to investigate, accrual occurs when the plaintiff has "reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be

---

[148]*Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995).

[149]*Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998) (quoting *Gust*, 898 P.2d at 967).

[150]*Logerquist v. Danforth*, 932 P.2d 281, 284 (Ariz. Ct.  App. 1996).

[151]*Doe*, 955 P.2d at 961.

[152]*Gust*, 898 P.2d at 966.

[153]*Doe*, 955 P.2d at 961 ("[C]ause of action accrues when plaintiff discovers injury is attributable to particular person's conduct; plaintiff must know both the what and who elements.") (citing *Lawhon v. L.B.J. Institutional Supply, Inc.*, 765 P.2d 1003, 1007 (Ariz. Ct. App. 1988)).

[154]*Id.* at 962.

on notice to investigate whether the injury might result from fault."[155]  For example, even if a patient knows that a medical procedure caused him pain, his malpractice cause of action does not accrue until he receives sufficient information that would cause a reasonable person to "commence investigating whether negligence was involved."[156]  In this context, "summary judgment is warranted only if the failure to go forward and investigate is not reasonably justified."[157]

"To determine when a cause of action accrues, an analysis of the elements of [the cause of action] is necessary."[158]  For present purposes the relevant element of Jefferson's breach of fiduciary duty claim is breach—whether Kritza breached his fiduciary duties to Jefferson through his unauthorized use of the LOC funds.  The relevant element of Jefferson's conversion claim is whether Kritza's "control or possession" of the LOC funds was unlawful.[159]

Kritza does not argue that Jefferson had actual knowledge of his use, control, or possession of the LOC funds before June 12, 2012.  Instead, he argues that Jefferson's claims accrued when he was put on "notice to investigate"[160] by (1) the book of financial information that Jefferson allegedly received in 2008 and (2) the series of events that caused Jefferson to question his finances in 2011 and 2012.

---

[155]*Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002).

[156]*Id. at* 995.

[157]*Id.* at 996.

[158]*Dube v. Likins*, 167 P.3d 93, 98 (Ariz. Ct. App. 2007).

[159]*See Case Corp. v. Gehrke*, 91 P.3d 362, 365 (Ariz. Ct.  App. 2004) ("Conversion is defined as 'an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another.'") (quoting *Sears Consumer Fin. Corp. v. Thunderbird Prods.*, 802 P.2d 1032, 1034 (Ariz. Ct. App. 1990)).

[160]Doc. 127 at 14.

1

### 1.    The 2007 Fiscal Year in Review Book

Jefferson testified that Kritza provided him with financial documents every two to three years that purportedly summarized all of his accounts.[161]   Kritza states in his declaration that in the summer of 2008 he brought a "year-end financial book titled '2007 Fiscal Year in Review' to Richard Jefferson at Jefferson's house in California" ("2007 book").[162]   Kritza states that exhibit 1 to his statement of facts is an accurate copy of the 2007 book.[163]   Twelve pages of this 133 page book contain monthly loan billing statements from Loan 4825.[164]   Among other things, these statements show that on December 21, 2006 the loan had a principal balance of $451,300 and a maturity date of October 5, 2007;[165] interest only payments were made every month, totaling $41,176.48; in April, June, and July there were three principal advances, totaling $47,000, bringing the principal balance to $498,300;[166] and by September 20 the loan's maturity date had been extended to August 5, 2008.[167]

The court cannot conclude as a matter of law that Jefferson's receipt of the 2007 book triggered his duty to investigate Kritza's use of the LOC.   At least two issues of material fact prevent such a conclusion.   First, there is conflicting evidence regarding whether Jefferson received this book.   At his deposition Jefferson said that he thought he had seen the 2007 book before, but he remembered only the picture on the front and

---

[161]Doc. 128-2 at 157; Doc. 161 at 7 ¶ 27; Doc. 134-1 at 19:8-19.

[162]Doc. 128 at 2 ¶ 4; Doc. 128-2 at 138 ¶ 3.

[163]Doc. 128-2 at 138 ¶ 4.   *See also* Kritza's Exhibit 1, doc. 128-1 at 3-136.

[164]Doc. 128-1 at 167; Doc. 128-2 at 1-11.

[165]Doc. 128-1 at 167.

[166]Doc. 128-2 at 4-6.

[167]*Id.* at 11.

nothing else.[168]  He testified that he did not recall exactly when he saw the book with

that picture, but he stated that it was probably around 2007.[169]  He also testified that he

could not recall whether the book he received from Kritza was the 2007 book or another

similar book.[170]

Second, even assuming that Jefferson had received this book, there is no

evidence that Jefferson actually saw the twelve pages that contain the Loan 4825

statements.  And it cannot be said as a matter of law that a reasonable person in

Jefferson's situation would have read and analyzed this relatively small segment of a

133-page book.

## 2.    The series of events that began in 2011

Kritza next focuses on the series of events that occurred between 2011 and "mid-

2012" that, according to Kritza, combined to put Jefferson on notice to investigate his

use of the LOC funds.[171]  According to the evidence put forth by Kritza, during this time:

• Jefferson learned that his finances were being affected by loans of which
  he was unaware.[172]

• Jefferson learned that Kritza had ceased sending his discretionary income
  to his financial advisor for investment.[173]

• Jefferson was confused about why Kritza was "stressed" about his
  finances during the 2011 NBA lockout, which led him to have Murnick
  review his Charles Schwab investment account.[174]

---

[168]Doc. 128-3 at 2:1-15.

[169]*Id.* at 2:16-19.

[170]*Id.* at 2:17-25, 3:1-5.

[171]Doc. 127 at 13.

[172]Doc. 128-2 at 165:2-11.

[173]*Id.* at 168:25-169:7.

[174]Doc. 128-2 at 160:19-161:1.

1

2

- Jefferson told Murnick that he was worried that Kritza may have taken money from him.[175]

3

- Murnick told Jefferson that he had some "concerns" with Jefferson's investment account.[176]

4

- Jefferson realized that his investment account contained between $5 and $10 million less than he expected.[177]

5

6

- Jefferson told Kritza on February 8, 2012 that he was concerned about how little was in his investment account.[178]

7

- Jefferson opened a Wells Fargo account that only he could access that he started depositing his paychecks into.[179]

8

9

- Jefferson hired Tucciarone, who reviewed Jefferson's tax returns and investment documents[180] and concluded that they "raised questions as to the financial controls and benefits of many of [Jefferson's] investments."[181]

10

11   This evidence establishes that before June 12, 2012 Jefferson had reason to

12   believe that his money was being mismanaged or misappropriated by one of his

13   advisors, including Kritza. And if Jefferson had contacted Alliance to inquire into the

14   LOC, there is a reasonable chance he would have discovered Kritza's use, control, or

15   possession of the LOC funds. The question here, however, is whether as a matter of

16   law Jefferson was on notice to commence such an investigation. According to

17   Jefferson, he was not even aware that he had an open LOC with Alliance. While it is

18   possible that the jury may interpret this lack of awareness as a lack of diligence, the

19   court cannot conclude as a matter of law that a reasonable person in Jefferson's

20   position would have had reason to connect his financial problems to the Alliance LOC.

21

22   [175]Doc. 128-3 at 54:9-12. *See also id.* at 58:11-22.

23   [176]*Id.* at 41:13-19.

24   [177]Doc. 128-2 at 170:5-19.

25   [178]Doc. 128-3 at 100-01.

26   [179]Doc. 128-2 at 179:25-180:7.

27   [180]Doc. 128-3 at 187-201.

28   [181]*Id.* at 176, 184; Doc. 161 at 8 ¶ 35.

1

### 3.   Jefferson's supplemental disclosure statement

2      In reply Kritza asserts that Jefferson's supplemental disclosure statement shows

3   that he is seeking $9.7 million in damages for Kritza's alleged misuse of not only the

4   Alliance LOC funds, but also funds from Jefferson's personal bank accounts.[182]   Kritza

5   argues that Jefferson's claims are untimely because Jefferson knew or should have

6   known he was missing millions of dollars, and that Kritza might have been involved.

7      Kritza's argument mises the mark.   Whether Jefferson knew or should have

8   known that Kritza was misappropriating millions of dollars from his personal bank

9   accounts is not at issue in this case.   Regardless of what Jefferson states in his

10  supplemental disclosure statement, his complaint is what controls.   His complaint

11  alleges that Kritza breached his fiduciary duties "through his unauthorized use . . . *of the*

12  *alleged Line of Credit* without Jefferson's knowledge."[183]   And it alleges that Kritza is

13  liable for conversion because of his unlawful "control or possession *of the LOC Fund*."[184]

14  Jefferson's complaint does not allege that Kritza misappropriated any other funds.[185]

15  Jefferson cannot recover damages for claims not alleged in his complaint.

16  **F.   Jefferson's Rule 56(d) Request**

17      At docket 162 Jefferson filed a declaration from Saalfeld that requests dismissal

18  of Alliance's summary judgment motion pending Kritza's production of the documents

19  he was ordered to produce at docket 217.   Specifically, Saalfeld states that he is

20  _____

21      [182]Doc. 212 at 2-3.

22      [183]Doc. 33 at 6 ¶ 26 (emphasis added).

23      [184]*Id.* at 9 ¶ 55 (emphasis added).

24      [185]*See id.* at 4 ¶ 11 ("T. Kritza admitted to Jefferson that he had used LOC funds without
25  Jefferson's consent or authorization in an amount exceeding $500,000."); *id*. ¶ 12 ("Jefferson
    did not consent to T. Kritza's personal use of these amounts owing on the LOC."); *id*. ¶ 13 ("[A]t
26  no point did Jefferson provide his consent as it relates to T. Kritza's personal and unauthorized
    use of monies relating to the LOC as alleged by Alliance."); *id*. at 4-5 ¶ 14 ("During the years
27  2004 to 2013, T. Kritza concealed from Jefferson that he had unlawfully used . . . the LOC
    funds. In doing so, T. Kritza misappropriated the LOC funds for his own personal use and
28  unauthorized us [sic] use, to which Jefferson has no involvement or ownership interest.").

-31-

1   awaiting production of documents relating "to the amounts received by Kritza and his

2   entities, including bank account records detailing transfer [sic] of such amounts from

3   Jefferson's accounts into Kritza Entities."[186]   Saalfeld states that he believes these

4   documents will raise additional issues of material fact regarding "Kritza's concealment of

5   unauthorized transfers from Jefferson's accounts, including the Alliance lines of credit,

6   and [Alliance's] potential knowledge thereof."[187]

7           The party moving under Rule 56(d) bears the burden of showing "(1) it has set

8   forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the

9   facts sought exist; and (3) the sought-after facts are essential to oppose summary

10  judgment."[188]   "Failure to comply with these requirements is a proper ground for denying

11  discovery and proceeding to summary judgment."[189]

12          Although Saalfeld sets forth the facts he hopes to elicit from discovery and his

13  basis for believing that these facts exist, he fails to offer any explanation of how facts

14  regarding Kritza's transfers from Jefferson's accounts are essential, or even relevant, to

15  Jefferson's opposition to Alliance's summary judgment motion.  Accordingly, Jefferson's

16  request is denied.

## V.  CONCLUSION

18          Based on the preceding discussion, Kritza's motion at docket 127 is **DENIED**.

19  Jefferson's motion at docket 129 is **DENIED**.  Alliance's motion at docket 131 is

20  **GRANTED**.  Kritza's motion at docket 132 is **GRANTED IN PART AND DENIED IN**

21  **PART** as follows: Kritza is **GRANTED** summary judgment on counts one, three, five,

---

23          [186]Doc. 162 at 4-5.

24          [187]*Id.* at 5.

25          [188]*Family Home and Finance Center, Inc. v. Federal Home Loan Mortgage*, 525 F.3d
26  822, 827 (9th Cir. 2008) (discussing former subdivision (f), the substance of which was moved
    to subdivision (d) in 2010).  *See* Fed. R. Civ. P. 56 advisory committee's note to 2010
27  amendments.

28          [189]*Family Home and Finance Center*, 525 F.3d at 827 (citation omitted).

nine, and ten; Kritza is **GRANTED** summary judgment on counts two, four, and eight to the extent those claims seek damages based on the approval, extension, or amendment of the Alliance LOC; and in all other respects the motion at docket 132 is **DENIED**.  Jefferson's request for Rule 56(d) relief at docket 162 is **DENIED**.

DATED this 13th day of November 2015.


/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE